IKE EISEN, ADMINISTRATOR OF THE ESTATE OF MORRIS EISEN, DECEASED, RESPONDENT, v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, APPELLANT.—91 S. W. (2d) —.

Kansas City Court of Appeals. January 27, 1936.

*Frank H. Backstrom* and *Paul E. Bayse* for respondent.

*Meservey, Michaels, Blackmar, Newkirk & Eager* and *Robert E. Coleberd* for appellant.

BLAND, J.—This is a suit upon a group life insurance policy. The case was tried before the court, without the aid of a jury, resulting in a judgment in favor of the plaintiff in the sum of $1000. Defendant has appealed.

The facts show that on June 30, 1931, the Associated Interstate Druggists, Inc., referred to in the testimony as the A. I. D. (and for convenience we will hereinafter so describe it) applied to the defendant for a group life insurance policy on its employees. Said policy, described as "one year renewable term insurance," was issued by the defendant on August 18, 1931.

The A. I. D. is a cooperative druggists' buying association composed of a number of druggists in Kansas City. Whether it is a corporation or a voluntary association is not shown in the evidence. However,

314

no point is made that employees of the individual druggists were not covered by the policy where the proper steps for coverage were taken. Such coverage is admitted. Some of the individual druggists employers paid all of the premiums covering the insurance of their employees and some of them required each of his employees to pay his (employees) part.

B. L. Medicus was the owner and operator of a drug store located at 43rd Street and Prospect Avenue, in Kansas City, and was a member of the A. I. D. Insurance under the group or master policy in favor of the individual employee was commonly initiated by the employee signing a card. There is a dispute between the parties as to the nature of this card, defendant insisting that it was an application to the defendant by the employee for insurance under the master policy and plaintiff insisting that it was a mere "data" card for information to the defendant as to the employees of the individual druggists and an authorization to the employer by the employee to deduct a certain sum per month from the employees salary to be paid toward the insurance premium. We will later discuss the nature of this card.

Cards at the Medicus store were signed by himself, his wife and three employees, the last consisting of a porter and two delivery boys. Two thousand dollars of insurance was taken by Medicus and his wife, each, and $1000 by each employee, making $7000 in all. The monthly premium provided to be paid on each $1000 worth of insurance was eighty-five cents. According to the cards signed the employees, each, were to pay sixty of the said eighty-five cents and Medicus was to pay the balance. However, Medicus paid the entire premium for all of his employees except that of the porter, his part of the premium being collected from him by Medicus. Medicus forwarded an amount equalling the entire premiums to the A. I. D. at its office in Kansas City, who collected from the numerous individual druggists all of the premiums under the master policy and forwarded the same to the defendant at its home office in Boston, Massachusetts.

On August 18, 1931, when the master policy took effect the two delivery boys employed by Medicus were Morris Saunders and Donald English. These employees signed the cards. The one signed by Donald English is typical of all the rest and reads as follows:

"Form 36.
"Ad 3-26 30,
"JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY
of Boston, Massachusetts.

| "Name of Employer | A. I. D. | | |
|---|---|---|---|

| "Name of Employee | | | Married or Single |
|---|---|---|---|
| | English | Donald | Francis |
| | Last | First | Middle |

| "Address | 3909 Olive Street | K. C. Mo. City State | Color W |
|---|---|---|---|

"Date of Birth   November 5th, 1917   Age nearest Birthday   14
Month   Day   Year

"Continually Employed Since
Month   Day   Year

"Occupation   General Employee   Dept.

"Amount of Insurance   $1,000

| "Name of Beneficiary | English | George H. | Relationship |
|---|---|---|---|
| | Last | First   Middle | Father |

"I hereby authorize deduction of 60c per month from my wages
to apply towards cost of this insurance
"DONALD FRANCIS ENGLISH.
" (Signature of Employee)
"Date
"Note—Day, Month and Year necessary initials not sufficient. Please
print names in full."

(These cards consisted of forms furnished by the defendant with printed questions and blank lines for answers to be inserted. The insertions were usually made by one, Rose, an insurance broker by profession, who solicited the master policy for the defendant. However, sometimes they were filled out by the individual druggist employer or the employee, himself.)

An individual certificate of insurance was issued to English, but on August 24, 1931, Morris Eisen, a minor, was employed by Medicus as a delivery boy in the place of English. Thereafter, English worked for Medicus "just occasionally, not steady." Rose testified that, so far as possible, he filled out these cards for the employees and they signed them but where the employee was not on duty the cards were left with the owner of the store to be signed; that these cards, after being filled out and signed, were delivered by Rose to the local branch of the defendant, which forwarded them to the defendant's home office

in Boston; that from these cards another card was made out at the home office containing the information shown on the original card; that the two cards, together with an individual policy for the employee, were mailed to the defendant's branch office in Kansas City which office delivered the cards made by the defendant to the A. I. D.'s general office in Kansas City, and retained the original card signed by the employee; that when the group policy was issued the defendant sent to the A. I. D. a file box for the purpose of filing the cards the former would deliver to the latter. When the cards were sent from the home office to Kansas City individual policies accompanied them for each of the employees mentioned in the cards. These policies were delivered by Rose to stores where such employee worked.

It appears that when the application for the group policy was taken the five persons above mentioned at the Medicus store, signed cards which were sent to the defendant's home office and individual policies were there issued to each of such five persons. Whenever any new persons were employed by the various druggists it was customary to have each of such employees sign a card which was forwarded to the defendant's home office in the same manner as above outlined with the same procedure.

The premiums were paid monthly by the A. I. D. to the defendant in the following manner: Rose, who had a copy of the cards in question and who kept a record of each individual certificate of insurance issued, made up from his records invoices or bills for the various stores on one sheet, the original of which was turned over to Mr. Smith, the accountant and bookkeeper for the A. I. D., Rose, keeping a duplicate. The master policy, being issued on the 18th day of the month, the invoices or the bills for the premiums on the insurance was for a period covering the time elapsing between the 18th of the month when they fell due and the 18th of the succeeding month. The bills were made out as near as possible after the first of the month following the month in which the day occurred when the current premium began to run. For instance, the premium for the month beginning on January 18th, and ending on February 18th, was required to be paid over to the defendant by the A. I. D. by the 18th of February, there being thirty days of grace allowed. Rose would forward his invoices or bills to the A. I. D. as near after the first day of February as possible so that the A. I. D. could collect the premiums shown to be due on the bills from the individual druggists, whose employees were insured, prior to the 18th of February. As before stated the policy provided a grace of thirty days for paying the premium so that the premium falling due on January 18th, was not required to be paid until February 18th.

Medicus' wife attended to the matter of making the payments on the insurance at his store and looking after the insurance of the in-

dividual employees. However, she neglected to notify the defendant, or any of its agents, or Rose, that Morris Eisen had been employed by Medicus. Eisen became ill with a cold on January 8, 1932. Evidently, his illness was not thought to be serious for the reason that he desired to continue at work but Medicus thought that he should stay at home, which he did. However, at this time Medicus looked through the individual policies of insurance in his possession. He found the one that had been issued to Donald English but discovered that none had been issued to Eisen. So he telephoned Smith at the office of the A. I. D. the next morning and told him to cancel the English policy and to issue one to Morris Eisen. Smith said that he would do so.

Rose testified that the "young lady" at the A. I. D. called him and advised him that Medicus desired the insurance on English cancelled and transferred to Eisen. He replied that it would be impossible to transfer it "but I would go up and get him (Eisen) to sign a card." Rose's records showed that English's insurance was cancelled on January 8th, and the witness assumed that it was about that time that the young lady called him up in reference to the matter. However, when notified of Medicus' desire, he went to the latter's store and inquired for Morris Eisen. He told someone there that he had come out to complete the arrangements for Eisen's insurance. He did not get the card signed for the reason that Eisen was not on duty. He left the card with Medicus, or his wife, who promised to secure Eisen's signature on the card and the necessary data. The witness went out again, about ten days later, and Eisen was reported as being ill. Someone in Mr. Medicus' store promised to have the card completed as soon as Eisen returned to the store. Rose testified that he went out to the store three times in all but never at any time was he able to see Eisen or get the card completed.

Medicus testified that Rose came to the store and left the card for him to fill out for Eisen; that he filled it out and turned it over to Eisen's sister who forgot to give it to him and the matter rested until February 12th, when Eisen died. It appears that the records of the A. I. D. did not at any time contain the name of Eisen and Rose's invoices continued to contain the name of English. The bills were sent to Medicus for premiums covering five people up to and including February, 1932, in which month Eisen died.

So far as the evidence shows Eisen did not apply for any insurance and did not know that there was any such thing as a group insurance policy under which he could be insured. In other words, it is claimed by the plaintiff, who sues as his administrator, that, although Eisen knew nothing of the existence of any insurance in his favor, or otherwise, still, he was covered by the group policy in question.

This necessitates a statement as to the terms of the group or master

policy, together with the application therefor, which formed the contract between the defendant and the A. I. D. The policy on page one under the heading "Schedule of Insurance on Each Life" reads as follows: "Executives, Managers and Assistant Managers ....$5,000 "Chief Clerks, Department Heads and Supervisory Employees 2,000 "All other employees ............................... 1,000." The policy then provides: "All employees who are actively at work on the effective date of this policy, August 18, 1931, who have made application for the insurance will be insured according to the above schedule. Eligible employees who have not applied for the insurance and employees hired after August 18, 1931, who have completed three months' continuous service will be insured according to the above schedule upon making application for the insurance; provided, whenever application is made after ninety days from date of eligibility, the Company reserves the right to require satisfactory evidence of insurability, without expense to the Company, before such insurance shall go into effect. The Employer shall notify the Company in writing as changes in the classification of the insured employees occur, and the Company will make proper adjustment of the insurance."

The policy also provides for the payment of an average premium rate which was to be determined by dividing the whole premium due at the commencement of the policy year by the number of thousands of dollars of insurance issued and it was agreed in the policy that the average premium to be paid upon the master policy in question during the first year was $9.93 on each $1000 of insurance, amounting to a total premium of $3,395.83. The latter sum being "subject to adjustment for changes in the personnel of the Employees insured, as hereinafter provided." It was provided in the policy that the premium might be paid quarterly or monthly and that "If any premium be not paid when due, this policy shall terminate except as hereinafter provided."

"*Grace Period.* A grace period of thirty-one days, without interest, during which this policy shall remain in force, will be granted for the payment of premiums or regular installments thereof, after the first.

"*Registry of Employees.* Employees are automatically insured in accordance with the Schedule of insurance on each life set forth on Page 1, subject to the terms of this policy. The employer shall furnish the Company with the names of all employees initially insured, of all new employees who from time to time become eligible for insurance in accordance with the schedule as set forth on Page 1, and of all employees whose insurance ceases through termination of employment, together with the necessary data to determine the premiums hereunder. Unintentional omission on the part of the employer to

send the name of any insured employee to the Company shall not invalidate the insurance on the life of such employee."

The policy further provides: "*Premium Adjustments.* Premiums for additional or increased insurance shall be charged from the middle of the policy month in which such additional or increased insurance takes effect to the end of the premium paying period. The unearned premiums or insurance to be discontinued shall be calculated from the middle of the policy month in which the employment is terminated. The Company will furnish the employer with a statement of any balance due or credited on account of first premium or adjustment in premiums due to changes in insurance by reason of additions, increases and terminations and said balance will be due when determined. *Insurance to be Discontinued.* The insurance of any employee covered hereunder shall end when his employment with the employer shall end." Certain exceptions as to discontinuance of insurance was provided in case of total disability of the employee. These exceptions are not material to the issues in this case. However, the policy provided: "Temporary lay-off or leave of absence for reasons other than physical disability as aforesaid shall not be considered as termination of employment for the purpose of this insurance unless the employer shall so elect."

The application for the policy provided that the policy should be issued on the employees of the A. I. D. who were actively at work on the effective date of the insurance and that "The names of such employees and other necessary particulars are to be furnished on forms provided by the Insurance Company and made part hereof. . . . . Each employee named on the prescribed forms is to be insured for an amount based on the following schedule. General Employees $1,000, Chief Clerks, Department Heads and Supervisory Employees $2,000 Executives, Managers and Assistant Managers $5000 New Employees will be insured according to the above schedule, upon completion of three months' continuous service."

The application also provided that the company would deliver to each employee, whose life was insured, an individual certificate. It also provided: "This policy with the application of the employer and the individual application, if any, of the employees insured, copies of which are attached hereto, shall constitute the entire contract between the parties."

It is insisted by the defendant that the court erred in failing to sustain its demurrer to the evidence, for the reason that the evidence shows that Morris Eisen was not covered by the master policy of insurance sued upon. In this connection it is contended that the law is well settled that the rights of the parties to this action are governed by the terms of the master policy. This is not disputed by the plaintiff. In fact, plaintiff insists that no individual policy was required

to be issued in order for the insurance to take effect upon the individual employee. We think that plaintiff's contention in this regard must be sustained. Although, the policy and application, no doubt, contemplated that all employees should have individual certificates or policies of insurance, as evidence of his inclusion in the master policy, it was not necessary that one be issued in order that there be insurance on the individual employee. [All States Life Ins. Co. v. Tillman, 226 Ala. 245, 248; Hardie v. Met. Life Ins. Co., 7 S. W. (2d) 746; Gallagher v. Simmons Hdw. Co., 214 Mo. App. 111.]

However, defendant insists that, in no case, could there be insurance upon the life of Morris Eisen without his having applied to the defendant therefor. In this connection it refers us to the provision of the master policy, which provides that "Employees hired after August 18, 1931, who have completed three months' continuous service will be insured . . . upon making application for the insurance;" that as Eisen made no application therefor, there could have been no acceptance of any individual application of Eisen on the part of the defendant, which was necessary in order for there to be a completed contract of insurance in his favor; that Eisen was not covered by the group policy and his administrator cannot recover in this suit.

It is true that the policy contains the language we have quoted. But the policy also provides that "employees are automatically insured;" that the employer should furnish the names of employees, including new employees, who from time to time become eligible for insurance and that "unintentional omission on the part of the employer to send the name of the insured employee to the company shall not invalidate the insurance on the life of such employee." The provision of the policy just cited appears to be in conflict with the one providing for applications by employees and no effort is made by defendant to harmonize them. (Probably on account of the fact that the case was not tried on the theory that there was a conflict, a matter hereinafter to be adverted to.)

However that may be, there is only one place in the policy in which an application on the part of the employee is mentioned and that is in the portion of the policy we have quoted from. The application on the part of the employee is referred to in the application for the group policy of insurance in only one connection and that is where the application states: "This policy, with the application of the Employer and the individual applications, *if any*, of the Employee insured, copies of which are attached hereto, shall constitute the entire contract between the parties." (Italics ours.)

According to the terms of the application and the policy they are to be construed together.

Taking the application for the master policy, alone, we think that it is plain that that application did not contemplate the necessity for

any application on the part of the individual employee. Even if the cards signed by the employees, which we have already referred to, are to be considered as applications, they were not in practice, attached to the policy for the group insurance policy as provided for in the application. As a matter of fact, we think that there was no application of any kind on the part of employees made or required under the master policy of insurance. The cards that were signed by the employees do not, upon their face, bear any resemblance to an application for insurance. They evidently were merely forms such as were referred to in the application for the master policy and were to be furnished by the employer under the provision of the policy which provides: "The employer shall furnish the company with the names of employees initially insured and of new employees . . . . together with the necessary data to determine the premiums hereunder" and were signed by the employee for the purpose of authorizing the employer to deduct a certain sum from the employee's salary per month to apply on his insurance. These cards seem to be similar to the authorization cards discussed in the case of All States Life Ins. Co. v. Tillman, supra, which there were held not to be applications for insurance. There was no reason for Eisen to sign one of these cards as the delivery boys paid no premium, Medicus did it for them.

It is true that Rose and the district manager of the defendant each testified that these cards were applications for insurance and there is no testimony to the contrary. This testimony was objected to on the part of the plaintiff, but the case was tried by the court without the aid of a jury, and the court permitted the evidence on the theory that it might throw some light upon the controversy. However, the cards, together with the application for the group policy and that policy, itself, speak for themselves and show that the cards did not constitute individual applications for insurance. So we again say that the only inference to be drawn from the evidence is that, in no case, was any such application made by the employee or required by the defendant. The provisions of the policy, that employees were automatically insured and the failure of the employer to furnish the company with the names of the employees initially insured and of all new employees, who from time to time become eligible for insurance, should not invalidate the insurance on the life of the employee, where such lack or omission was unintentional, must be given some meaning. These provisions are in conflict with those in the part of the policy providing for applications, as heretofore shown, and, under the well established rule, that the policy will be construed against the company and in favor of the insured, and the further rule that where the contract is ambiguous, the court will look to the conduct of the parties to find if they have put their own construction on it when

acting under it, we hold that it was unnecessary for Eisen to have made application for insurance in this instance.

It appears that the duty of bringing the attention of the defendant to the fact that the employee was entitled to insurance was placed upon the employer by the terms of the policy and that the employee was not to be held responsible for any innocent omission on the part of the employer, in this respect. If the two apparent conflicting provisions of the policy can be harmonized at all, it would appear that the policy and the application contemplated that, although the employee was automatically insured, he was granted the right to make a formal application for a policy of the kind that defendant wrote, providing, possibly, for some features additional to the master policy and if he did so the individual application became a part of the contract, which would then consist of the application of the employer for the master policy, that policy and the application of the employee and, if the employee did not elect to make an individual application for insurance, then nothing but the application of the employer and the master policy constituted the contract. Such a construction would result in the same holding as above indicated in the case before us.

Of course, it is well settled and, in fact, not disputed by the defendant, that group insurance of this nature is a contract made by the company and the employer for the benefit of a third party and the employee, when he comes under its provisions, or his beneficiary, is entitled to sue upon it. [Gallagher v. Simmons Hdw. Co., supra; Kingsland v. Mo. State Life Ins. Co., 228 Mo. App. 198, 202.] The insurance taken out on the lives of the employees of Medicus was a pure gift (except as to the porter) and as the insurance was beneficial to Eisen, it will be presumed that he accepted it although he was ignorant of its existence. [Tygard v. McComb, 54 Mo. App. 85; Telle v. Roever, 159 Mo. App. 115; Jones v. Jones, 201 S. W. 557; Gooden v. Rayl, 85 Iowa, 592; Strong v. Marcey, 33 Kan. 109; Griffin v. Schlenk et al. (Ky.), 102 S. W. 837.]

We are of the opinion that as the evidence shows that Medicus unintentionally omitted to notify the defendant or its agents of the employment of Eisen, that the latter was automatically insured under the group policy of insurance, on November 24, 1931, which date was three months after the date of his employment.

However, it is insisted by the defendant that there was no premium paid upon insurance for Morris Eisen under the group policy. Plaintiff contends that the matter of payment of the premium was between the A. I. D. and the defendant and the failure, if any, of Medicus to pay the A. I. D. is not material. We need not pass upon this contention of plaintiff's for the reason that it was not necessary for Eisen to pay the premium, himself, if Medicus paid it for him and we be-

lieve that Medicus paid the A. I. D. sufficient to cover the insurance on Eisen, as well as the other persons at his store.

There is no contention on the part of the defendant that the payment of the premium to the A. I. D., instead of to the defendant, is material to this issue. It seems to be admitted that payment to the A. I. D. was payment to the defendant. The facts show that Medicus promptly paid to the A. I. D. all premiums on the $7000 insurance at his store from the time of the issuance of the policy on August 18, 1931, until at least the month beginning on December 18, 1931, and expiring on January 18, 1932. There is evidence in the record that, although the A. I. D. continued to send the bill to Medicus in accordance with the invoices furnished by Rose for $5.95 each month up to and including the month beginning January 18th, and expiring February 18th, when Medicus received the bill for the premiums at his store, for that period, he deducted therefrom the sum of $1.70, which would be two months' premium on $1000 insurance. Defendant seems to have acquiesced in this deduction. Medicus testified that he paid $5.95 for every month, including the month in question, but Rose's testimony is to the contrary and as we have stated the evidence in this regard. (We have stated the evidence in the most favorable light to defendant, for a purpose to be hereinafter disclosed.) Rose could not say why Medicus deducted this sum but testified that he assumed that it was deducted for the months of December and January. A more plausible theory would be that Medicus had decided that he owed one month's premium on the insurance of Donald English and owed the premiums on Eisen's insurance from November 24 to the date of the deduction (February, 1932) which would be three months. In other words, Medicus should have paid four months (one for English and three for Eisen) on $1000 insurance, whereas, if he had paid in full in February when he made the deduction, he would have paid six months altogether. At any rate after the deduction in February was made Medicus had paid sufficient to cover all of the insurance at his store together with Eisen's insurance to the date of the latter's death. This contention must be ruled against the defendant.

It appears that Donald English did not entirely sever his connection with the store when Eisen took his place as a delivery boy on August 24, 1931. Defendant admits that he did not, thereafter, remain as a "regular worker at the store" being employed only upon occasions. We are of the opinion that English, not being regularly employed, did not continue to be such an employee as the master policy undoubtedly contemplated one be or become in order to be insured under it and, consequently, that no premium was paid by Medicus for English after the latter quit his regular employment on August 24, 1931.

The trial court decided this cause upon a different theory than we

have disposed of it. It was the opinion of the trial court, as shown by his findings of fact and declarations of law, that it was necessary for Eisen to have made an individual application to the defendant for insurance in order for plaintiff to recover but the court held that the policy did not provide for a *written* application and that the cards in question were not applications for insurance but were merely cards "furnished by the insurance company, on which the information required under 'Registry of Employees,' on page 2 of the insurance policy, may be given." It was the theory of the trial court that, as Medicus had called up the A. I. D. and asked that the English policy be cancelled and that one be issued in favor of Eisen, insurance was thereby effected upon the life of the latter and that the acceptance of the application by the defendant was not necessary.

We agree with the trial court in his conclusion as to the nature of the cards furnished by the defendant. Whether the court was correct in deciding that an application was actually made on behalf of Eisen sufficient to effect insurance upon his life, we need not say, for the reason it is quite apparent that no application was required to be made by or for him. From what we have said there was insurance effective upon the life of Eisen without any application made by or for him. Assuming that the trial court erred in its theory in deciding the case, still we will not reverse the judgment and remand the cause. This, for the reason that under all of the written evidence and undisputed oral testimony, and the disputed oral testimony, taken in its most favorable light to the defendant, a new trial could not result otherwise than in the same judgment.

It is true, as contended by the defendant, that ordinarily a case must be decided in this court upon the same theory that it was tried in the lower court. However, this rule is applied only where there is at least a possibility that another result might be reached by another trial. Where there has been a judgment for the defendant and error committed against plaintiff at the trial but the appellate court finds that there can be no recovery by plaintiff upon any theory, or where there had been a judgment for plaintiff and error committed against the defendant and there is a correct theory under which unquestionably plaintiff must recover in view of all of the facts and there is no room for the belief that any further facts would be developed at another trial, so that a new trial would result in the same judgment as the one under review, the appellate court will not reverse the judgment but will affirm it. [Ward v. Quinlivin, 65 Mo. 453; Renshaw v. Reynolds, 317 Mo. 484; Rolla Produce Co. v. Am. Ry. Exp. Co., 205 Mo. App. 646; Dodson v. Dedman, 61 Mo. App. 209; Daniel v. Atkins, 66 Mo. App. 342; Anderson v. Railroad, 131 Mo. App. 580.]

While defendant introduced no evidence, all persons who could have known any of the material facts were put upon the stand by plain-

tiff. These witnesses included even the agents of the defendant. It is true that the young lady clerk in the office of the A. I. D. was in California and her testimony was not produced, but there is no likelihood that she could throw any further light on the controversy.

The main issue at the trial, and in this court, was the construction to be given the terms of the policy. Of course, another trial would be of no help in disposing of this issue. Under all of the circumstances, it would serve no useful purpose to remand the cause.

The judgment is affirmed. *Shain, P. J.*, concurs.